IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| MATTHEW HALE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil No. 23-cv-01296-DWD |
| | ) | |
| FEDERAL BUREAU OF PRISONS, | ) | |
| | ) | |
| Defendant. | ) | |

## MOTION FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM

Defendant Federal Bureau of Prisons ("BOP"), by and through its attorneys, Steven D. Weinhoeft, U.S. Attorney for the Southern District of Illinois, and Kyle Christopher Oehmke, Assistant U.S. Attorney, and for its Motion for Summary Judgment and Supporting Memorandum, states as follows:

Plaintiff is currently serving a 480-month sentence for two counts of Obstruction of Justice and one count of Solicitation of a Crime of Violence. The latter count concerned Plaintiff's efforts to solicit the murder of a federal judge.

Plaintiff brings this action pursuant to the First Amendment to the United States Constitution. Seven claims remain, each relating to alleged suppression of and/or restriction on Plaintiff's speech. These claims, which exclusively seek injunctive relief, are as follows:

- Count I (Doc. 1) –suppression of Plaintiff's book, *The Triumph of Life: An Assault Upon the Values of the Current Society*;

- Count II (Doc. 1) – suppression of Plaintiff's article, "Thoughts on My Transfer to Marion CMU" (as originally written and as revised);

- Count V (Doc. 1) – suppression of Plaintiff's mail beginning in July 2020;[1]

---

[1] As discussed *infra*, the BOP submits Count V should be read as alleging wrongful restriction of Plaintiff's outgoing mail accompanying or concerning his specific writings at issue in Counts I, II, and VI.

- Count VI (Doc. 42-1) – suppression of Plaintiff's book, *Racism: A Reappraisal*;

- Count VII (Doc. 42-1) – restriction on Plaintiff's access to the BOP e-mail service ("TRULINCS") beginning in November 2021;

- Count VIII (Doc. 42-1) – restriction on Plaintiff's access to the U.S. mail beginning in October 2022; and

- Count IX – First Amendment retaliation.

The BOP seeks summary judgment on each claim on the following independent bases:

- Counts VII and VIII are moot, and Counts I and V are partially moot;

- All Counts are barred by claim preclusion (res judicata) and/or issue preclusion (collateral estoppel); and

- All Counts fail due to no genuine issue of material fact that the BOP violated the First Amendment.

## STATEMENT OF MATERIAL FACTS[2]

1. The seven remaining claims in this matter (Counts I, II, V, VI, VII, VIII, and IX) concern alleged violations of Plaintiff's right to free speech under the First Amendment to the United States Constitution.  *See* Docs. 1, 42-1, 58.

2. The seven remaining claims primarily, if not exclusively, concern Plaintiff's time in the Communications Management Unit (hereinafter "CMU") at the Federal Correctional Institution in Marion, Illinois (hereinafter "FCI Marion") from July 1, 2020, until June 9, 2025.  *See* Docs. 1, 42-1, 58; Declaration of Michael Collis (attached hereto as **Exhibit 1**), ¶¶ 32, 4, n.1.

3. The seven remaining claims exclusively seek injunctive relief.  *See* Docs. 1, 42-1, 58.

---

[2] As stated in the Court's Local Rules, the BOP's Statement of Material Facts does not count towards the page limit for a summary judgment motion.

4. Plaintiff's remaining claims primarily, if not exclusively, concern the actions and/or omissions of Michael Collis (hereinafter "Collis"), an Intelligence Analyst with the BOP, Counter Terrorism Unit (hereinafter "CTU") since July 2019. *See* Docs. 1, 42-1; Collis Declar., ¶ 2.

5. Most, if not all, of the writings at issue in this lawsuit involved initial review and recommendations by Collis.[3] *See* Collis Declar., ¶¶ 32-67.

6. Collis has been employed by the BOP for the past 19 years. Collis Declar., ¶ 2.

7. Before becoming an Intelligence Analyst, Collis was a BOP Corrections Officer, Senior Officer Specialist, SIS Technician, and Lieutenant. Collis Declar., ¶ 2.

8. As an Intelligence Analyst, Collis is responsible for monitoring communications involving inmates who are members of international or domestic terrorist groups in BOP custody, as well as high profile groups of inmates. Information from these communications are disseminated to BOP and other federal law enforcement agencies to ensure safety of institutions, staff, inmates, and the public. Collis Declar., ¶ 3.

9. When analyzing incoming and outgoing correspondence and publications, Collis refers as needed to BOP Program Statements on Correspondence, Incoming Publications, Communication Management Units, and the Trust Fund Manual, among others.[4] Def.'s Ans. to Interrogs. (attached hereto as **Exhibit 2**) #9, 14.

10. Collis' primary assignments include inmates assigned to CMUs within the BOP, which previously included the CMU at FCI Marion. Collis Declar., ¶ 4.

---

[3] Consistent with the Court's Protective Order (Doc. 93), many of the documents produced by the BOP in this matter were marked "CONFIDENTIAL" prior to production to Plaintiff's counsel. Per the Protective Order, these documents were not and are not to be provided to Plaintiff himself given the significant security, privacy, and confidentiality concerns. *See* Doc. 93, ¶¶ 9-11. Accordingly, the BOP is contemporaneously filing an Unopposed Motion to Keep Certain Exhibits under Seal.

[4] These BOP Program Statements and others are publicly available. *See* https://www.bop.gov/PublicInfo/execute/policysearch?todo=query.

11. This is the first known lawsuit in which Collis has been accused of violating an inmate's First Amendment Rights.  Collis Declar., ¶ 6.

12. While Plaintiff initially named Collis and the CTU as defendants in these proceedings, the Court dismissed all such claims on July 29, 2022.  *See* Doc. 28.

PLAINTIFF'S CRIMINAL BACKGROUND AND STATUS WITHIN THE CREATIVITY MOVEMENT

13. Since 2005, Plaintiff has been serving a 480-month sentence for Obstruction of Justice (two counts) and Solicitation of a Crime of Violence.  Collis Declar., ¶ 7, Ex. 1-A.  The solicitation count included Plaintiff's attempt to solicit the murder of a federal judge.  Collis Declar., ¶¶ 7, 18.

14. With the attempted murder of the federal judge, Plaintiff made no direct threat to the judge nor did he specifically direct any individual to act.  Instead, in a recorded conversation with a cooperating individual, Plaintiff allowed the cooperator to infer what actions Plaintiff wanted carried out.  Collis Declar., ¶¶ 7-8.  *See Hale v. United States*, No. 1:08 CV 94, 2010 WL 2921634, at *7 (N.D. Ill. July 22, 2010) (discussing recorded conversation of December 5, 2002, referencing the "Jew judge"), *aff'd*, 710 F.3d 711 (7th Cir. 2013).

15. As a federal inmate convicted of a crime, Plaintiff cannot hold a leadership role in a group or organization outside the prison.  Collis Declar., ¶¶ 24-25 (citing 28 C.F.R. § 541.3, Prohibited Act No. 334; 28 C.F.R. § 5401.14(d)(4)).

16. Likewise, Plaintiff cannot function as a religious leader or address himself with honorifics. Collis Declar., ¶ 25.

17. Despite these prohibitions, Plaintiff was --- and continues to try to be --- the leader of the "World Church of the Creator" or "Creativity Movement" (hereinafter, "Creativity Movement" or "Creativity"), which  embraces a white supremacist ideology, expresses hatred of "muds" or "non-white" people (especially Jews and African Americans), and uses extremely inflammatory

4

rhetoric in speaking about those deemed not "white".  Collis Declar., ¶ 8.

18. Plaintiff's conviction for soliciting the murder of a federal judge was directly tied to his leadership role in the Creativity Movement and his displeasure with an order the judge had issued against such group. Collis Declar., ¶ 8.

19. At the time he solicited the murder of the federal judge, Plaintiff was the "Pontifex Maximus" (supreme leader) of the Creativity Movement and was recognized by many white supremacists as a national and international leader of considerable renown.  Collis Declar., ¶ 9.

20. Plaintiff previously testified that he rejected the election of a new "Pontifex Maximus" and that his personal involvement was required for such election to have legitimacy.  Collis Declar., ¶ 9,  n.2, Ex. 1-B.

21. Plaintiff's supporters have murdered and attempted to murder in his name.  Collis Declar., ¶¶ 13-14.

22. Plaintiff had and continues to have many devotees and followers over whom he was and is capable of exerting influence.  Collis Declar., ¶ 9.

23. Plaintiff has continued to maintain influence and elevated status among adherents of racially motivated violent extremist ideology and maintains a large base of supporters and is viewed as a "cause célèbre".  Collis Declar., ¶ 34.

24. Plaintiff continues to use terms to demonstrate he is a Creativity leader in his correspondence, both inside and outside the prison. Collis Declar., ¶ 10, Ex. 1-C.

### CREATIVITY AS A SECURITY THREAT GROUP

25. Since 1993, the BOP has designated the Creativity Movement as a Security Threat Group (hereinafter "STG").  Collis Declar., ¶ 11.  *See, e.g., Hale v. Fed. Bur. of Prisons*, 759 Fed. Appx. 741 (10th Cir. 2019).

26. An STG designation is used to identify individual inmates affiliated with a group, gang, or

inmate organization observed acting in concert to promote violence, escape, drug, criminal, and/or terrorist activity.  The designation of a group, gang, or organization as an STG is made after careful consideration and based on the sound correctional judgment of Bureau staff.  Collis Declar., ¶ 11.

27. STG designations allow the BOP to closely monitor associated inmates and permit the Bureau to maintain institutional security and good order; safely and securely operate its institutions; protect staff and inmates; protect the public; and prevent crimes in and out of prison. Collis Declar., ¶ 11.

28. Heightened caution is required when BOP officials review communications associated with STGs because of the risks posed to the prison and public.  Collis Declar., ¶ 11.

29. Members and associates of the Creativity Movement often have documented violent histories, including racially motivated crimes targeting Jews and African Americans.  Collis Declar., ¶ 12, n.3.

30. The actions of Creativity adherents within BOP have led to rioting and the deaths of other inmates within the prison system.  Collis Declar., ¶ 12.

31. Plaintiff's influence and history within Creativity and among other white supremacists presents a unique management challenge to the BOP --- specifically, his status as a worldwide leader (or intended worldwide leader) of the Creativity Movement imparts to his followers an added urgency and willingness to act on his every word, whether or not he means his words as a true threat, incitement, or solicitation of violence.  Collis Declar., ¶ 15.

32. Plaintiff's continued relevance within the racially motivated violent extremist community poses a serious threat to institution staff, inmates, government officials, and the public.  Collis Declar., ¶ 34, Ex. 1-H.

33. The BOP National Gang Unit and its predecessor, the Sacramento Intelligence Unit, have

6

conducted threat assessments on the Creativity Movement in the past and as recently as 2024. Def.'s Ans. to Interrog. #10.

### PLAINTIFF'S HISTORICAL COMMUNICATIONS VIOLATIONS AND RESTRICTIONS

34. While in prison, Plaintiff has demonstrated a willingness and ability to control and influence Creativity Movement members and followers on the street. He has made telephone calls and authored correspondence, e-mails, and publications seeking to guide Creativity Movement members, followers, and members of other white supremacist groups. Collis Declar., ¶ 16.

35. On February 24, 2003, the Attorney General authorized the imposition of a Special Administrative Measure (hereinafter "SAM") on Plaintiff pursuant to 28 C.F.R. § 501.3 after it was determined there was a substantial risk that his communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of serious bodily injury to persons. This SAM restricted Plaintiff's access to the mail, the media, the telephone, and visitors and would be in place until February 2009. Collis Declar., ¶¶ 17-18.

36. In the years following removal of the SAM, the BOP placed Plaintiff on a variety of correspondence restrictions (including general correspondence restrictions) due to inappropriate communications, typically with other Creativity adherents and white supremacists.[5] Collis Declar., ¶¶ 18, 21-23, 26, n. 4, Ex. 1-D, Ex. 1-E, Ex. 1-F.

37. Such restrictions would be evaluated and modified by the BOP as appropriate. Collis Declar., ¶¶ 18, 19, 20, 27-28, Ex. 1-G.

---

[5] This included an attempt to send correspondence to the "Commander" of the National Socialist Movement, one of the largest neo-Nazi groups in the United States. Collis Declar., ¶¶ 22-23, Ex. 1-E. Such correspondence encouraged use of "mass activism tactics" as the "only way that we can win." Collis Declar., ¶ 22, Ex. 1-E.

38. For example, Plaintiff would be rejected for CMU placement and transferred from ADX Florence (supermax facility) to FCI Terra Haute (a lower-security institution) in May 2016.  Def.'s Ans. to Interrog. #17; Collis Declar., ¶ 28, Ex. 1-G.

39. In December 2016, BOP staff at FCI Terre Haute conducted an investigation of Plaintiff's correspondence that revealed he had recently authored several pieces of correspondence advocating violence or providing guidance on issues related to the Creativity Movement.  Collis Declar., ¶ 29.

40. This investigation led to Plaintiff's transfer to a higher security level facility, ADX Florence, in February 2017 so his communications could be more closely monitored.  Collis Declar., ¶ 29.

**PLAINTIFF'S TRANSFER TO THE COMMUNICATIONS MANAGEMENT UNIT AT FCI MARION**

41. Upon Plaintiff's return to ADX Florence, another investigation revealed a high amount of correspondence rejected due to safety and security concerns.  Collis Declar., ¶ 30.

42.  Such investigation found the ADX's communication-monitoring tools were imperfect to deter the threat posed by Plaintiff's communications inside and outside the prison environment; as such, he was recommended for placement in the BOP's CMU.  Collis Declar., ¶ 30, Ex. 1-H.

43. The BOP then transferred Plaintiff to the CMU at FCI Marion.  Collis Declar., ¶ 30.

44. Pursuant to 28 C.F.R. § 540.200(c) and BOP Program Statement 5214.05, "[t]he purpose of CMUs is to provide an inmate housing unit environment that enables staff to more effectively monitor communication between inmates in CMUs and persons in the community. The ability to monitor such communication is necessary to ensure the safety, security, and orderly operation of correctional facilities, and protection of the public. The volume, frequency, and methods, of CMU inmate contact with persons in the community may be limited as necessary to achieve the goal of total monitoring . . . ." *See* https://www.bop.gov/PublicInfo/execute/policysearch?todo=query#.

45. On July 1, 2020, Plaintiff arrived at the FCI Marion CMU, at which time Michael Collis became the CTU analyst assigned to monitor his non-legal communications. Collis Declar., ¶ 32.

46. Between July 1, 2020, through September 16, 2022,[6] Plaintiff had over 130 pieces of correspondence and e-mails, from him or to him, rejected for various reasons. Collis Declar., ¶ 33 (providing examples of such communications).

47. Such correspondence illustrated Plaintiff's desire to continue operating as a leader in the Creativity Movement and to share its ideology everywhere possible. Collis Declar., ¶¶ 33-34, Ex. 1-I (providing examples of such communications).

48. Collis recommended rejection of such correspondence as detrimental to the security, good order or discipline of the institution, threatening harm towards members of the public or staff, or encouraging activity that could lead to the use of physical violence or group disruption. Collis Declar., ¶¶ 33-34. *See* Ex. 1-I.

49. If Collis recommended rejection of correspondence, he authored a memorandum explaining his recommendation, which was subsequently reviewed and decided upon by the warden. Collis Declar., ¶ 33.

50. Between the same time period of July 2020 through September 2022, Plaintiff repeatedly misused the inmate to staff virtual messaging system, which included veiled threats towards BOP staff. Collis Declar., ¶ 35 (citing examples of such communications), Ex. 1-I at BOP 000402-000408, 012780.

51. On or about August 11, 2022, BOP staff recovered Creativity-related documents from three CMU inmates and determined Plaintiff was providing such documents to radicalize these

---

[6] In his Verified Supplemental Complaint (Doc. 42-1), Plaintiff alleges, "[C]ounsel for the BOP advised the BOP in August or September 2022 to take away [Plaintiff's] access to the U.S. mail . . . ." Doc. 42-1, ¶ 54.

inmates and to perpetrate racially motivated violent extremist ideology.  Collis Declar., ¶ 36.

52. On August 25, 2022, BOP unit officers observed Plaintiff attempting to recruit members to the Creativity Movement by targeting four specific inmates.  Collis Declar., ¶ 37.

53. During a search of his property at FCI Marion, Plaintiff was found in possession of Creativity-related books and several copies of *Mein Kampf*, including Plaintiff's translation of Hitler's work.  Def.'s Ans. to Interrog. #4.

**PLAINTIFF'S PUBLIC MESSAGING SERVICE (TRULINCS) RESTRICTION (COUNT VII)**

54. On October 20, 2021, Collis authored a memorandum addressed to the former warden of FCI Marion, Warden Daniel Sproul (hereinafter "Warden Sproul"), recommending restriction on Plaintiff's Public Message Service (also known as TRULINCS) (hereinafter "TRULINCS Restriction"), which is akin to e-mail for inmates in the custody of BOP.[7]  Collis Declar., ¶ 38, Ex. 1-J at BOP 000356-000358.

55. Pursuant to BOP Program Statement 4500.12, "[u]se of TRULINCS is a privilege; therefore, the Warden may limit or deny the privilege of a particular inmate . . . ."  *See* https://www.bop.gov/policy/progstat/4500.12.pdf, p. 126.

56. Collis' recommendation followed Plaintiff's repeated misuse of the public messaging feature of TRULINCS.  Collis Declar., ¶ 38, Ex. 1-J at BOP 000357-000358.

57. Collis' recommendation also followed review of Plaintiff's e-mail activity since he had been placed in the CMU, which included 53 e-mails that had been rejected since 2020, frequently due to "being detrimental to the security, good order or discipline of the institution, threatening

---

[7] Plaintiff's TRULINCS access had been removed at ADX Florence but allowed upon his initial placement in the CMU at FCI Marion.  Def.'s Ans. to Interrog. #6.

harm towards members of the public or staff, or encouraging which could lead to the use of physical violence or group disruption." Collis Declar., ¶ 38, Ex. 1-J at BOP 000356.

58. On November 3, 2021, following Collis' consultation with the BOP legal department, Warden Sproul concurred with his recommendation subject to a six-month review of the restriction to determine whether it was still warranted. Collis Declar., ¶ 38, Ex. 1-J at BOP 000359.

59. The TRULINCS Restriction was reviewed and considered approximately every six months thereafter, which Warden Sproul approved in 2022, 2023, 2024, and 2025.[8] *See, e.g.*, Collis Declar., ¶ 39, n. 11, Ex. 1-J at BOP 010280-010283.

60. While Plaintiff was under TRULINCS Restriction, he was still allowed general access to BOP computers so he could listen to music and the like. Collis Declar., ¶ 40.

61. During the six-month review of Plaintiff's TRULINCS Restriction in February 2026, Warden Bayless of FCI Cumberland[9] elected to discontinue such status, which became effective on or about February 26, 2026. Collis Declar., ¶ 41.

62. As an Intelligence Analyst and representative of the BOP CTU, Collis has maintained at all times, including through present date, that the TRULINCS restriction supported the BOP's commitment to public safety as well as compelled Plaintiff to communicate in a manner consistent with BOP rules and regulations. Collis Declar., ¶ 42.

63. As an Intelligence Analyst and representative of the BOP CTU, Collis has also maintained at all times, including through present date, that the TRULINCS restriction impeded Plaintiff's attempts to use his communications to engage in disruptive conduct and served to ensure adequate protection of the public. Collis Declar., ¶ 42.

---

[8] As discussed *infra*, Plaintiff was placed on Restricted General Correspondence status in October 2022, which was also subject to review every six months.

[9] On June 9, 2025, the BOP had transferred Plaintiff to FCI Cumberland. Collis Declar., ¶ 39.

64. The purpose of the TRULINCS Restriction was not to be punitive but rather to immediately disrupt and prevent information from being shared that could endanger the public, staff, or inmates. Collis Declar., ¶ 42.

**PLAINTIFF'S RESTRICTED GENERAL CORRESPONDENCE STATUS (COUNT VIII)**

65. On September 16, 2022, Collis submitted a memorandum through the CTU Chief to Warden Sproul recommending Plaintiff's placement on Restricted General Correspondence Status, which would limit his approved contacts to his immediate family, his attorney, and the courts "to restrict his attempts to use his communications to engage in disruptive conduct, threaten other individual and to ensure adequate protection of the public." Collis Declar., ¶ 43, Ex. 1-K at BOP 000402-000408.

66. Collis' memorandum discussed Plaintiff generally, his STG assignments, and his relevant background, including his criminal history, disciplinary history, longstanding outgoing and incoming correspondence surveillance, and associated issues. This memorandum cited recent examples of problematic writings authored by Plaintiff. Collis Declar., ¶ 43, Ex. 1-K at BOP 000402-000408.

67. On October 3, 2022, Warden Sproul concurred with Collis' recommendation. Collis Declar., ¶ 43, Ex. 1-K at BOP 000416.

68. Plaintiff's placement on Restricted General Correspondence Status was subject to consideration and review by BOP management approximately every six months thereafter. Collis Declar., ¶ 44, Ex. 1-K at BOP 000416, 000376-000393, 010280-010296.

69. The renewal of Plaintiff's Restricted General Correspondence Status involved preparation of memoranda by Collis recommending continuation of such status. Collis Declar., ¶ 44, Ex. 1-K at BOP 000376-000393, 010280-010296.

70. Collis' memoranda cited recent developments and issues with Plaintiff's communications, after which Warden Sproul (and, later, Warden Bayless at FCI Cumberland) concurred with each recommendation, most recently on June 23, 2025.  Collis Declar., ¶ 44, Ex. 1-K at BOP 000376-000393, 010280-010296.

71. Plaintiff's placement on Restricted General Correspondence Status did not carry any restriction on his use of legal mail, use of the telephone, or social visiting privileges.  Collis Declar., ¶ 43, Ex. 1-K at BOP 000416.

72. While Plaintiff was under Restricted General Correspondence Status, he was still allowed access to permissible literature and materials.  Collis Declar., ¶ 47.

73. If Plaintiff attempted to send correspondence to an approved contact during his time on Restricted General Correspondence Status, Collis conducted an individualized review of the document to determine whether it maintained nexus to a security threat,[10] including consultation with attorneys in the BOP legal department as appropriate, with a proposed rejection typically subject to review by the Warden.  Collis Declar., ¶ 45.

74. During the six-month review of Plaintiff's Restricted General Correspondence Status in February 2026, Warden Bayless of FCI Cumberland elected to discontinue such status, which became effective on or about February 26, 2026.  Collis Declar., ¶ 48.

75. As an Intelligence Analyst and representative of the BOP CTU, Collis has maintained at all times, including through present date, that limiting Plaintiff's communications network supported the BOP's commitment to public safety as well as compelled Plaintiff to communicate in a manner consistent with BOP rules and regulations.  Collis Declar., ¶ 49.

---

[10] Collis did not consider the mere mention of "Creativity", without more, as sufficient basis to recommend rejection of correspondence.  Collis Declar., ¶ 45.

13

76. As an Intelligence Analyst and representative of the BOP CTU, Collis has maintained at all times, including through present date, that limiting Plaintiff's communication network impeded Plaintiff's attempts to use his communications to engage in disruptive conduct and served to ensure adequate protection of the public.  Collis Declar., ¶ 49.

77. The purpose of the Restricted General Correspondence Status was not to be punitive but rather to immediately disrupt and prevent information from being shared that could endanger the public, staff, or inmates.  Collis Declar., ¶ 49.

## PLAINTIFF'S SPECIFIC WRITINGS AT ISSUE

78. Plaintiff's lawsuit concerns three specific writings: *The Triumph of Life: An Assault Upon the Values of the Current Society* (Count I); "Thoughts on My Transfer to Marion CMU" (Count II); and *Racism: A Reappraisal* (Count VI).  *See* Docs. 1, 42-1, 58.

### *The Triumph of Life: An Assault Upon the Values of the Current Society* (Count I)

79. This writing is a seven-chapter book that, among other things, espouses the purported virtues of separation of the races.  Collis Declar., ¶ 51.  *See* https://freematthale.org/2019/02/11/read-the-first-two-chapters-of-matts-third-unpublished-book/, p. 68 ("[A] garden that is being taken over by weeds (alien races), and whose fruit and vegetables are stunted in their growth and diseased otherwise, must surely be 'sick' under any rational understanding of the term, and that indeed is the plight which the 'garden' of our White Race is suffering today. . . . That is the basic thesis of this book and the author asserts it absolutely.").

### Chapters 1, 2, 4, 6, and 7 of *The Triumph of Life*

80. While housed at ADX Florence prior to his time in the CMU at FCI Marion, Plaintiff was allowed to send out Chapters 1 (titled "The Sickness of Our Times"), 2 (titled "The Values of the

14

Natural World"), and 4 (titled "Sex and the Sexes") of *The Triumph of Life*.  Collis Declar., ¶ 52. *See* https://freematthale.org/2019/02/11/read-the-first-two-chapters-of-matts-third-unpublished-book/.

81. While housed at FCI Marion, Plaintiff was allowed to send out Chapter 7 of *The Triumph of Life* (titled "Restoring Our Natural Vigor").  Collis Declar., ¶ 53, Ex. 1-L at BOP 001475-001504, 001677-001707.

82. With respect to the remaining chapters (Chapters 3, 5, and 6), of *The Triumph of Life*, these were initially rejected from dissemination outside of the BOP by ADX Florence.  Collis Declar., ¶¶ 33(e), 54, Ex. 1-L at BOP 005518-005520, 005996-005999, 006064-006067.

83. After being assigned to the CMU at FCI Marion and, later, FCI Cumberland, Plaintiff did not attempt to mail a copy of Chapter 6 (titled "Racial Ingratitude and the Question of Exploitation") of *The Triumph of Life*.  Collis Declar., ¶ 54.

### Chapters 3 and 5 of *The Triumph of Life*

84. After his arrival at the CMU at FCI Marion, on September 16, 2020, Plaintiff attempted to mail a copy of Chapter 5 (titled "Further Application of the Principle") of *The Triumph of Life* to one of his supporters, and Collis authored a memorandum to Warden Sproul recommending rejection of such correspondence.  Collis Declar., ¶ 55, Ex. 1-L at BOP 010616-010652,

85. Such memorandum identified several specific excerpts from the piece, noting these and others "contained vitriol, inflammatory language and disparaging comments about other racial groups which when presented to an outside audience or the public in the context of [Plaintiff's] beliefs or wishes can reasonably be believed to be detrimental to the security, good order, or discipline of the institution, and to pose a serious threat to the protection of the public, and potentially facilitate criminal activity."  Collis Declar., ¶ 55, Ex. 1-L at BOP 010647.

15

86. Warden Sproul ultimately concurred with the proposed rejection, and the BOP later rejected a subsequent attempt by one of Plaintiff's supporters to send him a copy of Chapter 5 on September 21, 2020.  Collis Declar., ¶¶ 33(e), 55, Ex. 1-L at BOP 010651.

87. On or about September 13, 2020, Plaintiff attempted to mail a handwritten copy of Chapter 3 (titled "Christian Values Versus Natural Values or: The Problem Posed by Christian Values to our White Racial Preservation") of *The Triumph of Life* to one of his supporters.  Collis Declar., ¶ 56, Ex. 1-L at BOP 010504-010576.

88.   Several words throughout the manuscript were circled by Plaintiff, which could represent coded threats, directions, or other language as members of an STG will often code language to avoid (or attempt to avoid) detection by BOP officials.  Collis Declar., ¶ 56.

89. On September 16, 2020, following review of the material by CTU staff, Collis authored a memorandum addressed to Warden Daniel Sproul recommending rejection of the attempted mailing of Chapter 3.  Collis Declar., ¶ 57, Ex. 1-L at BOP 010572.

90. Such memorandum identified several specific excerpts from the piece, noting these and others "contained excerpts from this book contained vitriol, inflammatory language and disparaging comments about other racial groups which when presented to an outside audience or the public in the context of [Plaintiff's] beliefs or wishes can reasonably be believed to be detrimental to the security, good order, or discipline of the institution, and to pose a serious threat to the protection of the public, and potentially facilitate criminal activity."  Collis Declar., ¶ 57, Ex. 1-L at BOP 010572.

91. Warden Sproul ultimately concurred with Collis' proposed rejection, and the BOP rejected a subsequent attempt by Plaintiff to mail out Chapter 3 to one of his supporters.  Collis Declar., ¶ 57, Ex. 1-L at BOP 010572, 010575, 010865-010937.

**"Thoughts on My Transfer to Marion CMU" (Count II)**

92. On September 13, 2020, Plaintiff attempted to send a lengthy e-mail to his mother entitled "Thoughts on my Transfer to Marion CMU" in which Plaintiff referred to himself as "Rev. (Reverand)" and that, among other things, sought to gather support for the teachings of Creativity. Collis Declar., ¶ 58, Ex. 1-M at BOP 000243-000245.

93. On September 15, 2020, Collis authored a memorandum addressed to Warden Sproul recommending rejection of such correspondence, stating, in pertinent part, as follows:

> [Plaintiff] is attempting to identify himself as a leadership figure in the STG of the Church of the Creator and address multiple individuals and members of the STG, in a statement likely intended for his mother to re-post on his website www.freematthale.org, as opposed to an individual message; which would circumvent controls in place at CMU, in which the volume, frequency, and methods, of CMU inmate contact with persons in the community may be limited as necessary to achieve the goal of total monitoring. Additionally, [Plaintiff's] use of his communications to advance and provide direction to members of the STG, pose a threat to public safety and the secure . . . orderly operation of the institution, and may facilitate criminal activity.

Collis Declar., ¶ 58, Ex. 1-M at BOP 000238-000242.

94. On September 16, 2020, Warden Sproul concurred with Collis' recommendation.  Collis Declar., ¶ 58, Ex. 1-M at BOP 000241.

95. On September 17, 2020, Plaintiff attempted to send an e-mail to his mother entitled "Thoughts on My Transfer to Marion CMU (Part One)", which repurposed the first paragraph of his initial e-mail, including addressing Plaintiff's "Brothers and Sisters, Friends and Supporters, [and] Fellow Creators".  Collis Declar., ¶ 59, Ex. 1-M at BOP 000251.

96. Collis, who suspected Plaintiff intended such writing to be posted to a website run by his supporters for further dissemination to Creativity adherents and Creativity curious, authored

17

another memorandum recommending rejection of this attempted communication, and Warden Sproul concurred.  Collis Declar., ¶ 59, n.15, Ex. 1-M at BOP 000246-000250.

97. On September 18, 2020, Plaintiff attempted to send an e-mail to his mother entitled "Thoughts on My Transfer to Marion CMU (Part Two)".  Collis Declar., ¶ 60, Ex. 1-M at BOP 10600.

98. On September 25, 2020, Collis authored a memorandum addressed to Warden Sproul recommending rejection of this attempted communication, and Warden Sproul concurred.  Collis Declar., ¶ 60, Ex. 1-M at BOP 010601-010605.

99. On October 5, 2020, Plaintiff attempted to send a lengthy e-mail to his mother entitled "Thoughts on my Transfer to Marion CMU (revised after earlier rejection)" addressed to "Brothers and Sisters, Friends and Supporters, [and] Fellow Creators".  Collis Declar., ¶ 61, Ex. 1-M at BOP 000266-000268.

100. On or about October 19, 2020, Collis authored a memorandum addressed to Warden Sproul recommending rejection of this communication as Plaintiff was trying to circumvent controls in place in the CMU and that his message "pose[d] a threat to public safety and the secure . . . orderly operation of the institution, and may facilitate criminal activity."  Collis Declar., ¶ 61, Ex. 1-M at BOP 000258-000262.

101. Warden Sproul concurred with this proposal.  Collis Declar., ¶ 61, Ex. 1-M at BOP 000261.

### *Racism: A Reappraisal* (Count VI)

102. This writing is a 56-page manuscript that espouses the purported virtues of racism and separation of the races.  Collis Declar., ¶ 62, Ex. 1-N at BOP 002211 ("Only separation can save

us, as I have said, but we must first know the truth of racism – that racist values are in fact <u>correct</u> – before that separation can occur." (emphasis in original)).

103. *Racism: A Reappraisal* contains numerous words throughout the document underlined by Plaintiff or another individual within the custody of BOP, which could represent coded threats, directions, or other language as members of an STG will often code language to avoid (or attempt to avoid) detection by BOP officials.  Collis Declar., ¶ 63, Ex. 1-N at BOP 011903-011960.

104. On November 22, 2021, Plaintiff attempted to mail to one of his supporters a draft version of *Racism: A Reappraisal*.  Collis Declar., ¶ 64, Ex. 1-N at BOP 001345-001404.

105. On November 29, 2021, Collis authored a memorandum to Warden Sproul concerning *Racism: A Reappraisal*.  *See* BOP 011606-011612.  This followed Collis' review of the document, which "identified several excerpts in which [Plaintiff] paraphrased statements and concepts from previously published books from the Church of the Creator Security Threat Group (STG)."  Collis Declar., ¶ 64, Ex. 1-N at BOP 011606.

106. Collis recommended the correspondence be rejected as "[Plaintiff's] beliefs or wishes can reasonably be believed to be detrimental to the security, good order, or discipline of the institution, and . . . pose a serious threat to the protection of the public, and potentially facilitate criminal activity."  Collis Declar., ¶ 64, Ex. 1- N at BOP 011610.

107. After Collis consulted with the BOP legal department, Warden Sproul concurred with his recommendation.  Collis Declar., ¶ 65, Ex. 1-N at BOP 011615.

108. On August 2, 2022, Plaintiff again attempted to send out *Racism: A Reappraisal*, and Warden Sproul concurred with Collis' recommended rejection of this submission.  Collis Declar., ¶ 66, Ex. 1-N at BOP 011900-011972.

19

**PLAINTIFF'S PRIOR LAWSUITS**

109. Plaintiff has previously filed lawsuits alleging First Amendment violations, including both speech and religious expression, while incarcerated in federal prison. *See, e.g.*, *Hale v. Fed. Bur. of Prisons*, 759 F. App'x 741 (10th Cir. 2019); *Hale v. Marques*, No. 1:19-cv-752-WJM (D. Colo. 2019).

110. One of these cases reached the U.S. Court of Appeals for the Tenth Circuit in 2019, after which the United States Supreme Court denied Plaintiff's request for a writ of certiorari. *See Hale v. Fed. Bur. of Prisons,* 759 Fed. Appx. 741 (10th Cir. 2019).

111. That same year, Plaintiff filed another lawsuit in the U.S. District Court for the District of Colorado alleging various violations of the First Amendment. *See Hale v. Marques*, No. 1:19-cv-00752. (D. Colo. Mar. 13, 2019).

## LAW AND ARGUMENT

### I.    SUMMARY JUDGMENT GENERALLY

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant may support the motion by citing materials in the record, including depositions, affidavits, and other documents. Fed. R. Civ. P. 56(c)(1); *Spivey v. Adaptive Mktg. LLC*, 622 F.3d 816, 822 (7th Cir. 2010). In assessing summary judgment, the court must construe all evidence, as well as inferences reasonably drawn therefrom, in the light most favorable to the non-moving party. *Spivey*, 622 F.3d at 822. "To successfully oppose the motion, the nonmovant must present definite, competent evidence in rebuttal." *Salvadori v. Franklin Sch. Dist.*, 293 F.3d 989, 996 (7th Cir. 2002).

Here, there is no material fact --- let alone a genuine issue of material fact --- to preclude an award of summary judgment to the BOP on all Counts.

## II.   COUNTS VII AND VIII ARE MOOT, AND COUNTS I AND V ARE PARTIALLY MOOT.

"The mootness doctrine implements Article III's Case or Controversy requirement by preventing federal courts from resolving questions that cannot affect the rights of the parties before them." *Ruggles v. Ruggles*, 49 F.4th 1097, 1099 (7th Cir. 2022). The case-or-controversy requirement endures throughout all trial and appellate proceedings. *Id*. "If intervening circumstances deprive the plaintiff of a personal stake in the outcome, "the action can no longer proceed and must be dismissed as moot." *Watkins v. U.S. Dist. Ct. for the C.D. Ill.*, 37 F.4th 453, 457 (7th Cir. 2022) (citing *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013)).

Here, two of Plaintiff's claims --- Counts VII and VIII --- are moot as made clear by the Declaration of Michael Collis. These claims concern Plaintiff's TRULINCS Restriction (Count VII) and Restricted General Correspondence Status (Count VIII). Warden Bayless of FCI Cumberland, however, elected to discontinue both statuses at their most recent six-month review. This was little more than eight months after Plaintiff's arrival to FCI Cumberland in June 2025. As Plaintiff is no longer under the TRULINCS Restriction or Restricted General Correspondence Status, and since Plaintiff only seeks injunctive relief, the Court is without a case-or-controversy to decide. *See Hale v. Ashcroft*, 683 F. Supp. 1189, 1197-99 (D. Colo. 2009) (holding cessation of Plaintiff's SAMs classification mooted his attendant claims). Counts VII and VIII are moot and summary judgment should be awarded to the BOP accordingly.

Two of Plaintiff's other claims --- Counts I and V --- are partially moot. With respect to *The Triumph of Life* (Count I), which comprises seven chapters, Plaintiff has been allowed to send Chapters 1, 2, 4, and 7 of the seven-chapter work outside of prison walls. In fact, three of these

21

writings (Chapters 1, 2, and 4) have already found their way onto a public website supportive of Plaintiff (freematthale.org). Thus, Count I should be considered moot except as to Chapters 3 and 5 of *The Triumph of Life*.[11]

With respect to the vague and conclusory claim of unlawful suppression of Plaintiff's mail (Count V), such claim is moot insofar as it turns upon the now-expired TRULINCS Restriction and Restricted General Correspondence Status. Put another way, to the extent Count V alleges unlawful suppression of Plaintiff's mail due to his former TRULINCS Restriction and/or former Restricted General Correspondence Status, such claim should be deemed moot.

## III.    EACH OF PLAINTIFF'S CLAIMS IS BARRED BY CLAIM AND/OR ISSUE PRECLUSION.

### A.    Claim Preclusion (Res Judicata) Generally

In the Seventh Circuit, claim preclusion (also known as res judicata) is governed by federal law when the earlier judgment was rendered by a federal court. *Ross v. Bd. of Educ.*, 486 F.3d 279, 283 (7th Cir. 2007). The principle of claim preclusion is rooted in the idea that once a claim has been definitively decided by a court of competent jurisdiction, it cannot be relitigated in a subsequent lawsuit between the same parties or their privies. *See id.* at 482.

Claim preclusion applies when there is "(1) an identity of the parties in both suits; (2) a final judgment on the merits in the first [case]; and (3) an identity of the causes of action." *Barr v. Bd. of Trs.*, 796 F.3d 837, 840 (7th Cir. 2015). First, the parties must be the same or in privity. The Supreme Court has long recognized "[t]here is privity between officers of the same government, so that a judgment in a suit between a party and a representative of the United States is res judicata in re-litigation of the same issue between that party and another officer of the

---

[11] As to Chapter 6, Plaintiff never attempted to send out such chapter during his time in the CMU at FCI Marion. Thus, any claimed suppression of Chapter 6 is premature and/or otherwise not ripe for consideration.

22

government." *Sunshine Coal Co. v. Adkins*, 310 U.S. 381, 402-03 (1940). *See also Church of New Song v. Establishment of Religion on Taxpayers' Money*, 620 F.2d 648, 654 (7th Cir. 1980) (allegations directed at officers of the same government fulfilled privity requirement). Second, the judgment in the first case must be on the merits --- i.e., based on legal rights rather than procedural issues or form. *Harper Plastics, Inc. v. Amoco Chems. Corp.,* 657 F.2d 939, 943 (7th Cir. 1981). Third, the identity of causes of action turns upon whether the claims arise from the same or nearly the same factual allegations. *See Barr*, 796 F.3d at 840. A court should consider the totality of the claims, including their nature, legal basis, applicable law, and factual backgrounds. *Ross*, 486 F.3d at 284 (citing *Burlington Northern R. Co. v. Strong*, 907 F.2d 707, 711 (7th Cir. 1990)). Claims share the same cause of action if involving a common nucleus of operative facts, even if not all claims were raised in the earlier case. *Daza v. State*, 2 F.4th 681, 683 (7th Cir. 2021).

The opinion in *Church of New Song* is instructive as the Seventh Circuit defined the scope of a "common nucleus of operative facts" in the context of alleged First Amendment violations during a plaintiff's incarceration. In that case, the plaintiffs filed multiple lawsuits across various federal courts alleging violations of their First Amendment right to freedom of religious expression in different penitentiaries across the country. 620 F.2d at 649-51. In analyzing whether claims arose from the same cause of action, the court assessed whether the same evidence could sustain both judgments, further noting the wrong for which redress was sought was the same in both actions. *Id.* at 652 (citation omitted). Despite the plaintiffs being incarcerated in a *different* prison at a *different* time under *different* supervision, the Seventh Circuit found the facts to be the same for the purpose of claim preclusion --- namely, both cases involved allegations of prison officials denying the plaintiffs the right to freely exercise their religion. *Id.* at 652. A Texas court had previously adjudicated these claims, conducting a thorough examination of the Church of the New

23

Song, its teachings, and the actions of its followers. *Id.* It concluded the church was not a legitimate religion but, rather, a "masquerade" designed to secure First Amendment protection for actions and illegal activities that prison officials would otherwise disallow. *Id.* The Texas court specifically noted the church's followers were predominantly in federal prisons, including FCI Marion, and one of its prominent figures had engaged in violent actions at the prison. *Id.* In short, because the *same* harm was alleged, the *same* redress was sought, and the *same* evidence would lead to the same outcome, the claim was barred by res judicata. *Id.*

**B.    Issue Preclusion (Collateral Estoppel) Generally**

While claim preclusion prevents re-litigation of an entire cause of action, issue preclusion (also known as collateral estoppel) is more narrowly focused. The doctrine of issue preclusion was described by the Supreme Court in *Montana v. United States*, 440 U.S. 147, 153 (1979), which emphasized a "right, question, or fact" that has been "distinctly put in issue and directly determined" cannot be disputed again. (citing *Southern Pacific R. Co. v. United States*, 168 U.S. 1, 48-49 (1897)). In the Seventh Circuit, the elements necessary to invoke issue preclusion are as follows:

1. First, there must be an identity of issues between the current and prior proceedings. *Bernstein v. Bankert*, 733 F.3d 190, 225 (7th Cir. 2012). This means the same issue must have been litigated and resolved in the earlier action, *Coleman v. Donahoe*, 667 F.3d 835, 853-54 (7th Cir. 2012), even if the issue arises in a different context or claim in the subsequent case. *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008).

2. Second, the prior judgment must be a valid and final judgment. *Bobby v. Bies*, 556 U.S. 825, 834 (2009).

3. Third, courts must assess whether applying preclusion would be fair by considering the opportunity for the party to have fully and fairly litigated the issue under a fair process, as well as whether preclusion would be unjust in light of the specific circumstances of the case. *Wolverine Mut. Ins. v. Vance*, 325 F.3d 939, 943 (7th Cir. 2003).

24

### C.       Plaintiff's Previously-Adjudicated First Amendment Claims

Plaintiff is no stranger to litigation, having litigated numerous First Amendment claims before the Tenth Circuit Court of Appeals (with the Supreme Court denying his subsequent writ of certiorari) and, later, the United States District Court for the District of Colorado.  *See Hale v. Fed. Bur. of Prisons*, 759 F. App'x 741 (10th Cir. 2019) (hereinafter "*Hale*"); *Hale v. Marques*, No. 1:19-cv-752-WJM (D. Colo. 2019) (hereinafter "*Marques*").  The holdings of the *Hale* and *Marques* Courts make clear Plaintiff's writings related to Creativity and his political views can be lawfully restricted by the BOP due to security reasons, which bears on claim and issue preclusion here.

In *Hale*, Plaintiff alleged, in pertinent part, as follows: (1) BOP mail restrictions concerning Creativity violated his First Amendment rights to free speech, free religious exercise, and free association; and (2) such restrictions were imposed as retaliation for his exercise of his speech and religious rights.  759 F. App'x at 744.  The Tenth Circuit upheld summary judgment on Plaintiff's free speech and free association claims, concluding the mail restrictions were reasonably related to legitimate penological interests due to Creativity's designation as an STG.  *Id*. at 751.  The *Hale* Court also found, since there was no genuine issue of material fact whether the mail restrictions violated Plaintiff's constitutional rights, his retaliation claim failed as it was premised upon alleged violation of a non-existent constitutional right.  *Id*.

Following issuance of the *Hale* Opinion, Plaintiff promptly filed and prosecuted 22 claims in the District of Colorado alleging various violations of the First Amendment.  *See Hale v. Marques*, No. 1:19-cv-752-WJM (D. Colo. 2019), Doc. 8, pp. 3-4 (*adopted by* Doc. 11) ("*Marques*").   The *Marques* Court determined that the Tenth Circuit had already adequately addressed free speech claims arising from speech pertaining not only to Creativity but Plaintiff's

'philosophy' more broadly, and ruled such speech is correctly subject to BOP restrictions. *Id.* at Doc. 11, p. 7. The court recommended certain free speech claims be dismissed with prejudice due to issue preclusion. *Id.* at Doc. 11, p. 8. One of these claims alleged "censorship" of Plaintiff's book, *The Triumph of Life*. *Id*. at Doc. 10, p. 3. Since the Tenth Circuit had upheld BOP restrictions on Plaintiff's correspondence referencing Creativity and any permutations or code names, the *Marques* Court held that claims regarding *The Triumph of Life* and Plaintiff's other writings aligned with the beliefs of Creativity (such as white supremacy) were effectively barred by issue preclusion. *Id.* at Doc. 100, p. 8. The *Marques* Court further determined claims involving Plaintiff's writings advocating his return to leadership in the white supremacy movement were barred by issue preclusion. *Id*. at Doc. 100, p. 19.

**D.      Claim Preclusion and Issue Preclusion as Applied to Plaintiff's Claims**

Here, since the Tenth Circuit and District of Colorado have already ruled on several of Plaintiff's claims that are similar (if not identical) to those before this Court, Plaintiff's claims are barred by claim and/or issue preclusion. More specifically, Plaintiff's writings that mention racist ideals or his role in the Creativity Movement (i.e., Counts I, II, V, and VI) are barred by claim preclusion, for attempting to publish material involving white supremacy, and issue preclusion, for challenging the BOP's settled authority to restrict his STG-related content. His causes of action predicated upon the BOP's response to his writings (i.e. Counts VII and VIII) likewise fail.

Perhaps most obviously, Plaintiff takes issue with BOP suppression of *The Triumph of Life* (Count I). This writing was squarely considered by the *Marques* Court and deemed precluded, which represented final judgment on the merits. In light of the identical parties and claim here, Count I is subject to claim preclusion.

26

Plaintiff's other specific writings fare no better.  In "Thoughts on My Transfer to Marion CMU" and its subsequent iterations (Count II), Plaintiff attempted to identify himself as a leader in the Creativity Movement and provide guidance in that regard, hence Collis' recommendation that such writings be restricted.  Plaintiff previously unsuccessfully litigated the suppression of writings concerning his past leadership in the white supremacy movement and his desire to continue leading before the *Marques* Court (there, in an article titled "Why Do I Want to Be Free?").  *See Marques*, Doc. 100 at pp. 18-19.  Res judicata or, alternatively, collateral estoppel should preclude re-litigation of these matters here.

In *Racism: A Reappraisal* (Count VI), Plaintiff touts the virtues of racism.  In support, Plaintiff cites and paraphrases other publications of the Creativity Movement.  The BOP's restriction of Creativity-related writings, as well as their repackaged "permutations" and "code names", is what Plaintiff unsuccessfully litigated before the Tenth Circuit and District of Colorado.  His claim should be precluded from further consideration accordingly.

Unlike Counts I, II, and VI, Count V is vague as to the particular writings and/or communications at issue.  The BOP submits Count V should be read as alleging wrongful restriction of Plaintiff's outgoing mail accompanying or concerning the aforementioned, specific writings.[12]  Any restriction of such outgoing mail is lawful for the same reasons as the attendant substantive writings, thereby triggering claim and/or issue preclusion.  Assuming *arguendo* Count V is read more broadly, Plaintiff's Verified Complaint admits, "*all* of his outgoing mail contains his mere opinions on racial matters and other topics . . . ."  Doc. 1, p. 11 (emphasis in original).  Indeed, the Collis Declaration cites numerous examples of correspondence potentially implicated

---

[12] In an effort to better understand the nature and extent of Count V, on August 22, 2025, the undersigned served Interrogatories on Plaintiff seeking identification and/or production of ten exemplar writings.  *See* Def.'s Interrogs. #8 (attached hereto as **Exhibit 3**).  Plaintiff, however, has never responded to such discovery.

by Count V, including messages addressed to leaders of the Creativity Movement, members of the Ku Klux Klan, and others committed to or curious about white supremacy. *See* Collis Declar., ¶ 33. Time and time again, Plaintiff espouses the purported virtues of Creativity and provides guidance on furtherance of the Creativity Movement. *See id.* The *Hale* and *Marques* Courts previously held restriction of this type of correspondence did not rise to a viable claim under the First Amendment; thus, Count V is precluded from further consideration.

Plaintiff's former TRULINCS Restriction (Count VII) and former Restricted General Correspondence Status (Count VIII) were the direct result of constant communication about the Creativity Movement, white supremacy, and related concerns. Both the *Hale* and *Marques* Courts held suppression of such communication was lawful and that the BOP should be afforded significant deference in its review and restriction of BOP communications, especially the former worldwide leader of an STG. To allow Plaintiff to now attack the expired TRULINCS Restriction and expired Restricted General Correspondence Status would be to undermine previously-decided cases as well as the tenets of claim and issue preclusion. *See Church of New Song*, 620 F.2d at 652. Counts VII and VIII fail accordingly.

Lastly, Plaintiff's claim of retaliation (Count IX) cannot stand as no predicate First Amendment claim survives. The *Hale* Court previously decided as much. *See* 759 F. App'x at 751 ("We have already determined that no triable issue of fact exists as to whether the mail restrictions violated [Plaintiff's] religious or free speech/association rights. Therefore, his retaliation claim likewise fails.").

Since claim and/or issue preclusion apply to all claims, the Court should award summary judgment in favor of the BOP and against Plaintiff on Counts I, II, V, VI, VII, VIII, and IX.

IV.    THE BOP DID NOT VIOLATE THE FIRST AMENDMENT AS A MATTER OF LAW.

Even if Plaintiff's claims somehow survive mootness and preclusion analysis, the BOP did not violate Plaintiff's First Amendment rights as a matter of law.

A.    **BOP Review and Restriction of Inmate Correspondence**

As Congress has delegated authority concerning the treatment and discipline of federal inmates to the BOP, *see* 18 U.S.C. §§ 3261, 4042, the Bureau may monitor and act upon outgoing and incoming inmate communications as appropriate. *See U.S. v. Sotelo*, 94 F.3d 1037, 1041 (7th Cir. 1996) ("Although the district court did not have the authority to impose the blanket communication restriction at issue in this case, the court certainly had the option to recommend that the Bureau of Prisons impose such a restriction."). Regarding the general correspondence of a federal inmate, "[t]he Warden may reject correspondence sent by or to an inmate if it is determined detrimental to the security, good order, or discipline of the institution, to the protection of the public, or if it might facilitate criminal activity." 28 C.F.R. § 540.14(d). This includes correspondence containing direction of an inmate's business, threats, and/or depiction of activities that may lead to physical violence or group disruption. *Id*.

The Warden can place an inmate on restricted general correspondence "based on misconduct or as a matter of classification" with determining factors to include the inmate's involvement in the aforesaid prohibited correspondence. § 540.15(a). An inmate on restricted general correspondence status is, absent extenuating circumstances, allowed to correspond with his spouse, mother, father, children, and siblings. § 540.15(d)(1).

Similarly, with respect to the inmate e-mail service, "[u]se of TRULINCS is a privilege; therefore, the Warden may limit or deny the privilege of a particular inmate . . . ." *See* https://www.bop.gov/policy/progstat/4500.12.pdf, p. 126. Indeed, the Southern District of Illinois

29

has dismissed claims against the BOP premised upon restriction on an inmate's use of TRULINCS. *See, e.g.*, *Teague v. True*, No. 18-cv-00253-JPG, 2018 WL 4335668, at *3 (S.D. Ill. Sept. 11, 2018) ("[T]here is an obvious connection between Plaintiff's restriction on access to TRULINCS and the interest in protecting the public and maintaining prison security, given that Plaintiff's past offense and relevant conduct arose from improper use of electronic communications."); *Gatch v. Walton*, No. 13-cv-1168-MJR, 2013 WL 6405831 (S.D. Ill. Dec. 6, 2013).

**B.      Constitutionality of Restrictions on Inmate Communications**

In *Procunier v. Martinez*, 416 U.S. 396 (1974), the Supreme Court established the standard for evaluating the constitutionality of restrictions on an inmate's *outgoing* communications. The standard articulated in *Procunier* is as follows:

> First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. Prison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements. Rather, they must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation. Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved.

416 U.S. at 413. While the Supreme Court provided a more deferential standard for evaluating any restriction of a prisoner's rights in *Turner v. Safley*, 482 U.S. 78 (1987), *Procunier* remains instructive as to an inmate's outgoing communications. *See Thornburgh v. Abbott*, 490 U.S. 401, 411-13 (1989) (holding the second *Procunier* consideration merely required restrictions to be "generally necessary" to protect the interests at stake). Indeed, the Seventh Circuit has continued to apply the *Procunier* standard to outgoing communications. *See Koutnik v. Brown*, 456 F.3d 777, 784 (7th Cir. 2006) ("Although [*Procunier*] later was overturned in part, the Supreme Court

30

specified in doing so that the decision would remain the standard for cases involving *outgoing* mail." (emphasis in original)).

With respect to an inmate's *incoming* communications, the standard set forth in *Turner* applies --- namely, "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. at 89. The reasonableness of the restriction invites consideration of four factors. "First, there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Id*. at 90. Second, the court examines "whether there are alternative means of exercising the right that remain open to prison inmates." *Id*. at 90. Third, the court must assess "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Id*. Fourth and finally, the court must consider the availability of alternatives. *See id*.

With the constitutional framework set forth in *Procunier* and *Turner*, the Seventh Circuit has upheld BOP restriction of inmate communications and afforded considerable deference to prison officials determining the applicability of a restriction to particular communications. In *Koutnik v. Brown*, 456 F.3d 777 (7th Cir. 2006), the Seventh Circuit upheld a Wisconsin law restricting all outgoing communications related to inmate gangs and affirmed its application to a letter bearing a swastika and Ku Klux Klan reference. The government's interest in rehabilitation of the inmate was sufficient under *Procunier* for the restriction to be valid. The *Koutnik* Court further held the racially inflammatory communication was not "an effort to establish 'constructive, wholesome contact' with the outside community that would foster successful reintegration into society; it was an effort to appeal to groups that would hinder, rather than foster, respectful human interaction, both inside and outside of prison." *Id*. at 786 (citing *Procunier*, 416 U.S. 412, n.13.).

Of note, the inmate was not a part of a prison inmate gang, and the symbols and references were not explicitly referring to a specific gang. The *Koutnik* Court acknowledged prison staff are best suited to determine whether a communication is related to a prison gang. *Id.* at 785.

In *Williams v. Mierzejewski*, 401 F. App'x 142 (7th Cir. 2010), the Seventh Circuit affirmed the district court's award of summary judgment, which extended "substantial deference" to prison staff in evaluating whether a letter contained gang-related language. *Williams v. Mierzejewski*, No. 08–C–721, 2010 WL 11597972, at *4 (E.D. Wisc. 2010) ("[T]he parties disagree whether Williams was affiliated with a gang, and whether certain words in the seized letter were gang references or simply slang. . . . [I]t is irrelevant whether Williams was a gang member . . . what matters is that prison staff, with relevant expertise reasonably assessed language in his letter as gang-related."). The district court held the government had a sufficient interest in prisoner rehabilitation and prison security to satisfy *Procunier* while restricting a letter that contained the words "chief" and "deck". 2010 WL 11597972, at *2 ("Prisoners have constitutional rights, but prisons can limit these rights if the restriction is related to legitimate penological interests." (citing *Turner*, 482 U.S. at 89)).

In *Jackson v. Pollard*, 208 F. App'x 457, 460 (7th Cir. 2006), the Seventh Circuit made clear, "[p]rotecting the general public is a legitimate penological interest . . . ." The *Jackson* Court further acknowledged "great deference to prison administrators' 'expertise' when they proffer such justifications [concerning the general public] for prison regulations." *Id.* (citing *Koutnik*, 456 F.3d at 785). *See also Van den Bosch v. Raemisch*, 658 F.3d 778, 786 (7th Cir. 2011) ("Courts are to accord 'substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for

32

determining the most appropriate means to accomplish them.'" (citing *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003)).

### C. The Subject Restrictions Comport with the First Amendment

Here, Plaintiff's claims primarily concern his former TRULINCS Restriction (Count VII), his former Restricted General Correspondence Status (Count VIII), suppression of three specific writings (*The Triumph of Life*, "Thoughts on My Transfer to the Marion CMU", and *Racism: A Reappraisal*) (Count I, II, and VI), and suppression of outgoing mailings (Count V).[13]  The BOP process resulting in these restrictions was appropriate.  Michael Collis, an Intelligence Analyst with nearly twenty years of federal service to the BOP, authored memoranda setting forth various rationale and recommendations for the restrictions.  Such recommendations were, at times, discussed with the BOP legal department.  Such recommendations were always provided to the Warden, who always independently determined whether to adopt the proposed restriction.  When Warden Sproul required six-month review of Plaintiff's TRULINCS Restriction and Restricted General Correspondence Status, Collis and the Warden followed through accordingly.

With respect to the substance underlying the BOP restrictions --- as laid bare in Collis' numerous memoranda --- such rationale comports with the First Amendment.  This is especially apparent when considering Plaintiff himself.  Plaintiff has had a long, significant history within the Creativity Movement, which arguably culminated when he solicited the murder of a federal judge while acting as its "Pontifex Maximus" (supreme leader).  His supporters would thereafter murder and attempt to murder in his name.  *See* Doc. 29, pp. 2-4 ("Even within the walls of a maximum-security prison . . . [Plaintiff] and Creativity continued to cause problems.  Prisoners

---

[13] Again, the BOP submits Count V should be read as alleging wrongful restriction of Plaintiff's outgoing mail accompanying or concerning *The Triumph of Life*, "Thoughts on My Transfer to the Marion CMU", and *Racism: A Reappraisal*.

following Creativity murdered fellow inmates and started race riots . . . .").  Despite being in federal custody for more than two decades, Plaintiff holds considerable influence over white supremacists outside of the BOP and persistently seeks to increase this influence both within and beyond prison walls.  *See Hale v. Fed. Bur. of Prisons*, 759 F. App'x 741, 750-51 (10th Cir. 2019) ("There is overwhelming evidence in the record that Creativity poses an institutional security risk and that [Plaintiff] has sought to advance the white-supremacist goals of Creativity in ways that pose a danger both inside and outside of ADX.  By limiting [Plaintiff's] ability to send and receive mail communicating Creativity's message, the BOP mitigates internal and external safety risks.").

As Creativity has long been considered an STG with a history of violence, the BOP has both a substantial interest and a legitimate penological interest in restricting communications about the Creativity Movement and its tenets.  Such restrictions promote security and order as well as act to protect the public, prison staff, other inmates, and even Plaintiff.  The BOP's interest in lawful restriction of communication is especially heightened with Plaintiff, who has authored hundreds, if not thousands, of problematic writings while in federal custody.  Nearly all of the documents at issue discuss white supremacy or racist philosophy, and Plaintiff admits as much.  *See* Doc. 1, p. 11 ("*[A]ll* of his outgoing mail contains his mere opinions on racial matters and other topics . . . ." (emphasis added)).  Many of the documents discuss or suggest Plaintiff's leadership (former or current) within Creativity, including the unauthorized use of honorifics.  Some of the documents, such as *Racism: A Reappraisal*, contain words underlined or circled by Plaintiff himself, which could well have a coded meaning to Creativity adherents.  Neither *Koutnik* nor *Mierzejewski* involved an STG, yet the Seventh Circuit found the speech restrictions to satisfy the standard set forth in *Procunier*.  Similar to *Koutnik*, Plaintiff's communications do not establish "constructive, wholesome contact" with the outside community.

34

Even with the TRULINCS Restriction and Restricted General Correspondence Status, arguably the broadest restrictions at issue, Plaintiff maintained alternative means of communication and expression.  He could appropriately correspond with his immediate family, use the telephone, and have social visits.  He could use the BOP computers and maintain magazine subscriptions.

As each of the restrictions at issue satisfy the First Amendment, there is no genuine issue of material fact for this Court to decide.  Thus, Plaintiff's retaliation claim (Count IX) is without predicate and fails.  *See Hale*, 759 F. App'x at 751.  The Court should award summary judgment for the BOP and against Plaintiff on all remaining counts accordingly.

## CONCLUSION

The United States Supreme Court and Seventh Circuit --- as well as federal appellate and district courts addressing myriad other First Amendment claims brought by Plaintiff --- have long acknowledged considerable deference should be given to the BOP in its review and handling of inmate correspondence.  The BOP submits such deference should be afforded here given the unique management challenge posed by Plaintiff for more than two decades.

WHEREFORE, for the foregoing reasons, the Federal Bureau of Prisons prays the Court grants its Motion for Summary Judgment and enters judgment in favor of the BOP and against Plaintiff on Counts I, II, V, VI, VII, VIII, and IX.  The BOP further prays for all other relief just and proper under the circumstances.

Respectfully submitted,
FEDERAL BUREAU OF PRISONS

STEVEN D. WEINHOEFT
United States Attorney

***s/ Kyle Christopher Oehmke***
KYLE CHRISTOPHER OEHMKE

35

Assistant United States Attorney
United States Attorney's Office
Nine Executive Drive
Fairview Heights, Illinois 62208-1344
Phone: (618) 628-3700
Fax: (618) 622-3810
E-mail: Kyle.Oehmke@usdoj.gov